UNITED STATES of America, Plaintiff,

v.

The COUNTY OF WESTCHESTER, Defendant.

NATIONAL BUSINESS AIRCRAFT ASSOCIATION, Plaintiff,

and

Federal Aviation Administration, Involuntary Plaintiff,

v.

Andrew P. O'ROURKE, County Executive of the County of Westchester; Samuel S. Yasgur, Attorney of the County of Westchester; the Board of Legislators of the County of Westchester, and the County of Westchester, Defendants.

PANORAMA FLIGHT SERVICE, INC., Plaintiff,

v.

COUNTY BOARD OF LEGISLATORS FOR the COUNTY OF WESTCHESTER, Westchester County, Samuel S. Yasgur, Attorney for County, and Andrew P. O'Rourke, County Executive, Defendants.

AIRCRAFT OWNERS AND PILOTS ASSOCIATION, Plaintiff,

v.

Andrew P. O'ROURKE, County Executive of the County of Westchester; Samuel S. Yasgur, Attorney of the County of Westchester, the Board of Legislators of the County of Westchester, and the County of Westchester, Defendants.

Nos. 83 Civ. 3499(RJW), 81 Civ. 6177(RJW), 81 Civ. 6243(RJW) and 81 Civ. 6227(RJW).

United States District Court, S.D. New York.

Aug. 24, 1983.

Joseph, Powell, McDermott & Reinger, P.C., Washington, D.C., Herzfeld & Rubin, P.C., New York City, for plaintiff National Business Aircraft Ass'n.

John S. Yodice, Frederick, Md., Callahan & Wolkoff, P.C., New York City, for plaintiff Aircraft Owners & Pilots Ass'n.

Rudolph W. Giuliani, U.S. Atty., Susan Campbell, Asst. U.S. Atty., New York City, for involuntary plaintiff Federal Aviation Admin.

Samuel S. Yasgur, White Plains, N.Y., for defendant County of Westchester, et al.

McDonough, Marcus, Cohn & Tretter, New York City, for plaintiff Panorama Flight Service, Inc.

## FINDINGS OF FACT

ROBERT J. WARD, District Judge.

### A. *The Parties*

The Federal Aviation Administration ("FAA") is an operating administration of the United States Department of Transportation and is responsible for the regulation and control of the National Flight Control System. The National Business Aircraft Association ("NBAA") is a corporation organized under the laws of the State of New York whose purpose is to protect and promote the interests of member companies in the operation of their aircraft. NBAA has 51 member companies which regularly use the Westchester County Airport ("the Airport"). These member companies operate 134 aircraft including turbo jets, turbo propellor driven airplanes, propellor driven airplanes and helicopters. The Aircraft Owners and Pilots Association ("AOPA") is a corporation organized under the laws of the State of New York whose purpose is to promote and protect the interests of owners and pilots of general aviation aircraft. AOPA's 265,000 members own approximately 70 percent of the active general aviation aircraft fleet and fly approximately 70 percent of the general aviation hours logged. Panorama Flight Service Inc. ("Panorama") is a New York corporation with a principal place of business at the Airport engaged in the business of providing cargo and passenger air transport services. It operates a variety of light twin-engine aircraft between the Airport and various locations in the northeastern part of the United States. A portion of its cargo operations is conducted between 7 p.m. and 4 a.m.

The County of Westchester ("the County") is a municipal corporation organized and existing under the laws of the State of New York. Andrew P. O'Rourke is the County Executive of the County. Samuel S. Yasgur is the County Attorney. The Westchester County Board of Legislators is the legislative body of the County. Under § 101.21 of Chapter 617, Laws of 1937, Charter of Westchester County, the legislators are empowered to "exercise all powers of local legislation and administration as provided for counties in Article 9 of the Constitution of the State of New York."

### B. *The National Airport System*

The FAA has prepared a national airport system plan pursuant to the Airport and

Airway Development Act of 1970, and its successor legislation. The Airport is included in and is a part of the national airport system plan and is a part of the New York City metropolitan area airport system. The airspace and air traffic routing of aircraft arriving and departing at the New York City metropolitan area airports is a complex, highly structured and integrated system designed to provide for maximum air safety and efficiency in the use of the available navigable airspace. FAA air traffic controllers are responsible for establishing and maintaining the separation of aircraft during their operation. An "aircraft operation" is defined as either a landing or a take-off and is either "local" or "itinerant." A "local operation" is an aircraft operation within a 50-mile radius of an airport or within sight of an airport control tower, or an aircraft known to be departing or arriving from flight in local practice areas, or an aircraft executing practice instrument approaches. An "itinerant operation" is any operation other than a local operation. Airport operations are classified by the FAA as air carrier or commercial operations with other operations considered as general operations.

In 1976, 1980 and 1982, respectively, there were a total of approximately 1,289,000, 1,349,000, and 1,257,000 aircraft operations at the five major airports in the New York City metropolitan area, i.e., John F. Kennedy International (JFK), LaGuardia (LGA), Newark International (EWS), Teterboro (TEB), and Westchester County (HPN). Of these total operations there were approximately 207,000 operations at HPN in 1976 and 1980 and 183,000 operations there in 1982. This represents respectively 16.1%, 15.3% and 14.6% of the total operations at these five New York City metropolitan area airports. In 1976, 1980 and 1982, respectively, there were a total of approximately 511,000, 577,000, and 462,000 general aviation operations at the five major airports in the New York City metropolitan area. Of these general aviation operations there were approximately 188,000, 189,000, and 162,000 such operations at HPN in each of the respective years. This represents 36.8%,

32.8% and 35.1% of the total general aviation operations at these five airports in each of the respective years.

Of the total 183,000 operations at HPN in 1982, 162,000, or approximately 88.5%, were general aviation operations. In contrast to HPN, in 1982 there were 28,000, 25,000 and 38,000 general aviation operations at JFK, LGA, and EWR respectively for a total of 91,000 such operations out of 834,000 total operations at these three airports in that year.

Aircraft departing from HPN and LGA to the south and west are routed through and controlled by FAA air traffic controllers at the New York Terminal Radar Approach Control ("TRACON"). Peak times for air travel in the New York metropolitan area occur from 7:00 a.m. to 10:00 a.m. and from 3:00 p.m. to 10:00 p.m. During the morning peak period, particularly between 7 a.m. and 9 a.m., there are a substantial number of take-offs from HPN, LGA and EWS. Many of these departures follow the same route to the south and west out of the airspace controlled and managed by the New York TRACON, known as the Solberg route. What is involved in this process from an air traffic control perspective is the integration and intermingling of HPN, LGA and EWS departures with other air traffic from other airports overflying the area so as to assure the separation of air traffic for safety. There presently is a restriction of 20 miles separation between these flights, a separation which translates into approximately 4 minutes between flights or approximately 15 flights per hour along a specific route.

C. *Westchester County Airport*

The Airport is owned by the County. It provides services and facilities to persons traveling in and engaged in interstate commerce. The FAA operates and maintains an air traffic control tower at the Airport, which is staffed by Federal air traffic controllers. There are over 400 aircraft based at the Airport, approximately 275 to 350 of which are propeller driven and turbo-prop small aircraft. The balance are business jet

aircraft. Air navigation equipment has been installed and is currently being operated at the Airport by the FAA pursuant to an agreement with the County.

The Airport is under the overall jurisdiction of the County Department of Public Works, and directly under the Transportation Division of that Department. The highest County official under the County executive with responsibility for the Airport is the Commissioner of Public Works, a position currently held by Commissioner Frank Bohlander. Working directly for Commissioner Bohlander as Director of Transportation Facilities is Arthur Ludwig.

Many AOPA members are based at the Airport, and many others have and in the future will operate aircraft to and from the Airport, all in interstate commerce. A number of these members have a continuing need to operate at the Airport during the hours from midnight to seven a.m.

The total operations at the Airport during the fiscal years 1981 and 1982 were as follows:

| | TOTAL OPERATIONS | |
|---|---|---|
| CATEGORY OPERATION | FY 81 | FY 82 |
| Instrument | 144,672 | 117,625 |
| Total Aircraft | 186,065 | 183,645 |
| Total Itinerant | 145,183 | 141,935 |
| General Aviation Itinerant | 124,382 | 121,704 |
| Air Carrier | 2,621 | 2,685 |

The Airport's ranking nationally based upon 377 airports and in New York State based upon 15 airports during the fiscal years 1981 and 1982 in all operations was as follows:

| | NATIONAL RANKING | | NY STATE RANKING | |
|---|---|---|---|---|
| CATEGORY OPERATION | FY 81 | FY 82 | FY 81 | FY 82 |
| Instrument | 88 | 94 | 6 | 6 |
| Total Aircraft | 109 | 83 | 6 | 6 |
| Total Itinerant | 73 | 72 | 3 | 4 |
| General Aviation Itinerant | 39 | 26 | 1 | 2 |
| Air Carrier | 236 | 206 | 10 | 10 |

During the year 1982, the Airport accounted for approximately 31% of the itinerant general aviation operations in the New York metropolitan area. The FAA predicts that between 1982 and 1990, total operations at the Airport will increase by 40% and that general aviation activity will grow in greater proportion to all other types of aircraft operations.

### D. *Federal Grants to Westchester County for the Airport*

Since 1970, the County has applied for and received from the FAA development grants totalling approximately $4.2 million for projects involving the Airport, and has applied for and received grant-in-aid funds for Airport planning totalling approximately $250,000. The terms, conditions and assurances prerequisite to receiving grant monies, and in particular applicable to the grants from FAA to the County, are set forth in those grant agreements.

One of the assurances made by the County in accepting those grants, and one of the conditions to receipt of those grant monies, as set forth in the grants at paragraph 2, page 2, is that the County would carry out the projects in accordance with the Airport and Airway Development Act of 1970, 49 U.S.C. §§ 1701 *et seq.,* which until September, 1982 required, *inter alia:*

As a condition precedent to his approval of an airport development project ..., the Secretary shall receive assurances in writing, ... that—

(1) The airport to which the project for airport development relates will be available for public use *on fair and reasonable terms and without unjust discrimination....*

(5) All of the facilities of the airport developed with Federal financial assistance and all those usable for landing and takeoff of aircraft will be available to the United States for use by Govern-

ment aircraft in common with other aircraft *at all times....*

49 U.S.C. § 1718 (emphasis added) (superseded by Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 2201 *et seq.,* at § 2210(a)(1) and (a)(6)).

The grant applications and agreements signed by the County as grantee also require that the grantee comply with FAA regulations promulgated pursuant to the Airport and Airway Development Act of 1970. Those regulations require that a grantee have complied with previous grant agreements. The County provided assurances to the Secretary of the United States Department of Transportation that all of the facilities of the Airport developed with Federal assistance and all those usable for landing and take-off of aircraft would be open and available at all times and would be available to the United States for use by government aircraft in common with other aircraft at all times.

As of May, 1983, the FAA declined to provide further grant-in-aid funds to Westchester for the Airport based on its decision that the County had failed to comply with the terms, conditions and assurances set out in the existing grant agreements by enacting a curfew at the airport.

### E. *Background of the Curfew*

Surrounding the Airport are the suburban communities of Harrison, Rye, North Castle, Rye Brook, Port Chester and Mount Pleasant, New York and Greenwich, Connecticut. In July, 1974, a lawsuit was filed by the Town of Greenwich and others, entitled *Town of Greenwich v. Westchester County,* No. B–74–280 (D.Conn.). The lawsuit primarily concerned noise and was settled by an agreement between the parties to the litigation to create a negotiating committee that would attempt to deal with the issues raised by the lawsuit.

A committee was formed, and commenced operating in September, 1975. One member of the committee was Ms. Joan Caldwell, its co-chairperson, President of the Northwest Greenwich Homeowners Association. The other members of the committee were representatives of the Town of Greenwich, NBAA, and the Westchester County Pilots Association. Meetings were attended by these representatives, as well as a representative of the FAA. The committee made significant contributions to noise abatement at the Airport. It worked with owners and operators at the Airport to reduce touch-and-go operations; restrict the use of reverse thrust, except in emergency conditions; initiate higher flights around the Airport; reduce engine runups or maintenance tests on the runway; and obtain noise complaint information through the installation of a noise complaint telephone number. Further, the committee recommended noise abatement flight procedures and a voluntary curfew at the Airport limiting take-offs and landings between the hours of 11:30 p.m. and 6:30 a.m. Information concerning the voluntary curfew was disseminated by the NBAA, the FAA and the County.

In 1978, the County was named as a defendant in an action entitled *Posillippo v. Morgan,* 78 Civ. 4629 (S.D.N.Y.), which arose in part from noise caused by aircraft utilizing the Airport. This action was subsequently settled. The stipulation of settlement in no way bars the relief sought herein.

Since 1981, the Airport has implemented with the approval of the FAA five procedures that have resulted in the abatement of noise:

a. revised runway No. 16 departure procedures, implemented May, 1982;

b. revised runway No. 34 arrival procedures, implemented December, 1981;

c. revised helicopter arrival and departure routes, implemented early 1983;

d. higher altitudes on runway No. 34 departures, implemented January, 1983; and

e. the raising of airspace during late evening to morning, in conjunction with the New York TRACON, implemented June 1981.

The magnitude of sound is measured in units of decibels. In measuring aircraft noise, the decibel scale commonly used is the A-weighted scale ("dBA"). It represents the magnitude of sound in terms related to human responses to sound. From November, 1977 through April, 1978 a study of aircraft noise impact between the hours of 11:00 p.m. and 6:30 a.m. ("the 1978 Study") was conducted for the County by Pan American World Services, Inc., which manages the Airport for the County. The 1978 Study was conducted through the use of a portable noise monitor. The results of the 1978 Study were that the hourly average aircraft noise levels at all locations exceeded 60 dBA on only three occasions after 11:00 p.m., and that on no occasion did the hourly average aircraft noise levels exceed 55 dBA between 12:00 midnight and 7:00 a.m. at any off-airport location, and that the noise levels during the voluntary curfew period were within acceptable limits. The Report of the 1978 Study concluded that the "existing voluntary night jet operating restrictions are effective and that any hard and fast rule would make an insignificant difference in cumulative community noise exposure level."

At no time from the conclusion of the 1978 Study until the imposition of the curfew on October 1, 1981 did the County install noise monitoring equipment. Nor did the County promulgate any regulation establishing quantified levels of noise to be permitted in or around the Airport.

According to Commissioner Bohlander, the only noise monitoring conducted by the County at the Airport from the conclusion of the 1978 Study until the imposition of the curfew was random monitoring by a hand-held noise monitor. This random monitoring confirmed the absence of any significant noise impact on the Airport environs during the hours of 12:00 midnight to 7:00 a.m.

Prior to the 1978 Study, the County retained a consultant to conduct a study of noise impact on the area around the Airport, which study is known as the Westchester County Airport Noise Control and Land Use Compatibility Planning Study: Short Term Noise Abatement Plan ("ANCLUC Study"). The ANCLUC Study designated areas of land around the Airport as the primary impact area and the secondary impact area, the primary impact area consisting of the area surrounding the Airport which is exposed to a noise level not exceeding 65 Ldn and the secondary impact area consisting of that area surrounding the Airport which is exposed to a noise level not exceeding 60 Ldn. "Ldn" is a measure of the average of total noise in a particular area over a 24-hour period expressed in units of decibels with a 10 decibel penalty added to all noise occurring during the nighttime hours (10 p.m. to 7 a.m.).

The results of the ANCLUC Study showed that the land use impact in the primary impact area was comparatively small; only 335 persons were estimated to live within the primary impact area. The ANCLUC Study recommended against a closing of the Airport during nighttime hours, as such action would result in "only negligible reduction in nighttime jet operations, . . . and would result in a small change in net community noise exposure." The Study rejected imposition of a nighttime curfew, and instead suggested several operational changes to minimize noise impact. The ANCLUC Study recommended immediate implementation of specific routes for helicopter traffic and the use of a preferential runway system for specific times.

Despite the recommendations of the ANCLUC Study and the 1978 Study by the Airport Manager, in or around December, 1980, the County Board of Legislators passed Resolution 225–A of 1980, directing that the administration (the County Executive) impose a curfew at the Airport, emergency operations excepted. The County Executive declined to impose a curfew and returned the resolution to the Board of Legislators. When Resolution 225–A of 1980 was passed, the committee that grew out of *Town of Greenwich v. Westchester County, supra,* passed a resolution asking that the County submit the issue to the

committee so that it would be able to assist in solving the noise problem. The County did not respond. Consequently, the committee's expertise was never utilized by the County to analyze the nighttime noise impact over areas surrounding the Airport. The committee thereafter passed a resolution opposing the implementation of a curfew.

In 1977, the County Board of Legislators, created an Airport Advisory Board. (See § 277.221, Chapter 227, Laws of Westchester County). The Advisory Board was set up in part to make suggestions on Airport noise problems. In March or April, 1981, the Advisory Board, by a majority of its members, voted to suggest to both the County Executive and the Board of Legislators that a total curfew would not be in the best interests of the County, and that the noise problem should be resolved in ways short of a total mandatory curfew.

On or about August 27, 1981, prior to the enactment of the legislation imposing the curfew, the Committee on Community Health & Hospitalization and the Budget Committee of the County Board of Legislators met with representatives of the FAA who at that time advised the County representatives in attendance that:

FAA/DOT and the Congress have stated that the "curfew" alternative to noise reduction is an option to be considered in Noise Abatement Planning. However, what we need to make clear at this time is that we consider this curfew option as an action of last resort; an action appropriate only when all other noise reduction techniques have been found to be inadequate and after an appropriate public hearing process.

Additionally, at the August 27, 1981 meeting a representative of the FAA stated:

I would like to take this opportunity to suggest that action on a nighttime curfew be tabled to allow time to further develop and implement less severe but potentially equally effective operational controls. At the same time and prior to a curfew decision, I would request that an economic/noise cost-benefit analysis be accomplished to provide you (the County) with the critical economic cost data needed in this important decision.

Aside from the August 27, 1981 meeting, the County Board of Legislators did not communicate with the FAA or the Secretary of Transportation to seek approval for the curfew or obtain their concurrence.

The Commissioner of Public Works, Mr. Bohlander, was not asked by the County Board of Legislators for his opinion concerning the imposition of a curfew although several members of the County Board of Legislators appear to have asked Mr. Bohlander informally about his opinion concerning the curfew at the Airport. He recommended against a total ban on flight operations, as did the Airport Manager, Scott Piper, of Pan American World Services.

At no time from the conclusion of the 1978 Study until the imposition of the curfew did the County itself conduct or publish, or ask the FAA to conduct, any analysis or study considering the potential impact of the curfew: (1) on local or national flight safety; (2) on the greater New York City metropolitan area airport system; (3) on the national airport system; (4) on diversions of local or itinerant operations at the Airport; (5) on the flow of interstate commerce in the New York City metropolitan area or in the nation; or (6) in terms of economic burdens, on airport users. Furthermore, from the time of the publication of the ANCLUC Study until the present, the County has not asked the FAA to initiate a preferential runway system at the Airport.

From the time of the passage of Resolution 225–A of 1980 by the County Board of Legislators, until the implementation of the curfew legislation on October 1, 1981, the County did not conduct any study of any kind to determine the location of noise-impacted areas, or quantify the level of noise from any source in, around or over such areas. Furthermore, the County did not, at any time prior to the passage of Act 54–1981, analyze the Airport complaint log in any detailed way to establish the noise-im-

pacted areas in and around the Airport, or to determine a quantified noise level in those areas.

### F. The Curfew

On or about September 1, 1981, the County Board of Legislators enacted Act 54–1981 amending the Rules and Regulations for the Airport. The legislation provides as follows:

> Implement a mandatory curfew. No aircraft shall arrive or depart from Westchester County Airport between the hours of 12:00 midnight and 7:00 a.m. except in case of emergency.

Act 54–1981 was duly approved by the County Executive and was placed into effect on October 1, 1981, at 12:01 a.m.

The curfew prohibits the arrival or departure on a non-emergency basis of any aircraft between the hours of 12:00 midnight and 7:00 a.m. It applies to all aircraft regardless of the noise emission level or degree of noise produced. Violation of the curfew is an offense punishable upon conviction by a fine not to exceed $100.00 or by imprisonment not to exceed thirty (30) days, or both.

The County has not enacted any regulations specifying procedures by which an aircraft approaching or departing the Airport between the hours of 12:00 midnight and 7:00 a.m. is to obtain clearance to land or depart in case of an emergency, or from whom emergency clearance is to be obtained. In addition, the County has not enacted regulations or standards to establish what conditions constitute an emergency. Nor has the County defined what constitutes an emergency under the curfew legislation. The decision as to what constitutes an emergency is made by Commissioner Bohlander on a case-by-case basis.

Pursuant to a stipulation and order filed in the instant litigation on January 19, 1982, the County has permitted aircraft operations by Panorama Flight Services, Inc., between the hours of 12:00 midnight and 7:00 a.m. This stipulation was superseded by a preliminary injunction issued by this Court on July 18, 1983. In addition, the County stipulated on May 11, 1983 to waive any enforcement of the curfew between the hours of 6:30 a.m. and 7:00 a.m. during the pendency of these actions.

### G. Post-Curfew Noise Data

As noted above, the County Board of Legislators passed Act 54–1981 on September 1, 1981 without conducting any analyses or studies. Although the County Board of Legislators' principal concern in enacting the curfew was noise, they neither commissioned a noise study nor had before them any noise data when they enacted the curfew.

Subsequent to enactment of the curfew, the County retained the consulting firm of Bolt, Beranek & Newman ("BBN") to design a temporary noise monitoring program at the Airport in accordance with a stipulation entered into between the parties to this litigation. The stipulation provided that the parties would cooperate in a 60-day nighttime operation test period allowing arrivals between midnight and 6:30 a.m. of aircraft that did not exceed certain noise limits. The County also directed BBN to design and conduct a survey of community response to the associated changes in nighttime noise exposure comparing the pre-test period and the test period. The study was conducted in 1982. In the course of the BBN study, noise level monitors were positioned at various locations in communities around the Airport to record all noise events which exceeded a preset level. The level was set at 60 to 65 decibels, as low as possible so as to record all aircraft noise events while excluding other noise events. The techniques and methodology employed in the BBN 1982 Study were available and had been utilized prior to August, 1981.

The results of the BBN 1982 Study were published as Report No. 5083 entitled "Evaluation of Noise Exposure and Community Response due to Temporary Reinstitution of Night Landings at Westchester County Airport, Spring, 1982." The BBN 1982 Report concluded that "the overall pattern of findings did not support an inference of substantial community reaction to

the operational changes at HPN [Westchester County Airport]." The persons who conducted the Study confirmed in the Report their belief that the sample sizes were sufficient to detect any appreciable changes in annoyance, sleep interference and other effects associated with potential changes in aircraft noise exposure.

The community survey conducted by BBN did not demonstrate any correlation between the resumption of night flight operations during the test period and the annoyance level of residents in communities surrounding the Airport; in two instances annoyance levels went up when night flights were resumed, and in two instances annoyance levels went down. The complaints received during the hours of the nighttime test period were reviewed by BBN. The BBN 1982 Report stated that the results of the review "support the concern that some complainants are confusing operations unrelated to HPN [Westchester County Airport] with aircraft using the airport," and that a majority (61–62%) of the complaints received between midnight and 6:30 a.m. during the test period were from non-Airport operations.

The BBN 1982 Report did not find evidence of a higher sensitivity to noise among residents who live around the Airport or under airways from the Airport; rather, it concluded that "no unusual sensitivity to general environmental noise was apparent in the responses to Questionnaire Item 2 in any of the interviewing areas." The Report's comparison between the test period and the period prior to the test revealed: (1) that in two out of five instances, the nighttime noise level (night Leq) declined during the test period when flights were resumed at night; and (2) that in three out of five instances, the average 24-hour sound level (Ldn) decreased during the test period when flights were resumed at night.

The Ldn measured by BBN both before and during the test period included not only noise from aircraft using the Airport but all noise occurring in the area of the noise monitor above a specified threshold, including all overflights, flights en route to and

from other area airports, police sirens, and the like. The community survey conducted by BBN did not demonstrate any correlation between the actual increase in night flight operations during the test period and the number of survey respondents who noticed more aircraft noise during the test period.

During the course of the BBN study, aircraft based at the Airport were allowed to land during curfew hours within defined noise limitations: unlimited if the FAA Advisory Circular 36–3B ("AC 36–3B") approach noise level was 76 dBA or less, and a maximum of two per hour with a weekly average of six per night if the demonstrated or the AC 36–3B approach noise level was between 77 dBA and 87 dBA with a plus or minus 2 dBA meter tolerance for demonstrations. The AOPA analysis of the general aviation fleet shows that over 95% of the general aviation fleet has an approach noise level of 76 dBA or less, and that over 70% of the fleet based at the Airport has an approach noise level of 76 dBA or less. Of the business aircraft participating in the test, each and every operation fell within the defined noise limitations, either by virtue of meeting published advisory circular numbers, or by demonstrated ability to operate at or below those numbers. The business aircraft are part of the general aviation fleet. The AOPA study demonstrates that about 87–90% of the general aviation fleet at the Airport has an approach level of 87–89 dBA. Noise levels of no greater than 55 A-weighted decibels in the home, or 72 A-weighted decibels outside the home, cause little or no disruption of sleep, *i.e.* less than 10% of the population would be annoyed or disrupted.

Noise contours prepared by the FAA's Office of Environment and Energy based upon its computer-based integrated noise model, show that certain aircraft can operate at night without annoying or interfering with the sleep of residents around the Airport. The specific aircraft studied included single engine propeller driven airplanes, twin engine propeller driven airplanes, twin engine turbo propeller driven

airplanes, and some turbo jet airplanes. The noise contours show the geographical area in and around the Airport within which approaching and landing aircraft, which are operating at maximum gross weight and a maximum noise, will equal or exceed 72 A-weighted decibels and therefore may disrupt sleep, and outside of which such aircraft will probably not cause annoyance or disrupt sleep. In most cases, the 72 A-weighted decibel contours fell over lightly populated or non-populated areas.

Moreover, the noise contours show the geographic area in and around the Airport in which approaching and landing aircraft, operating at maximum gross weight and speed, will equal 77 A-weighted decibels. Operations approaching and meeting the 77 A-weighted decibel noise level may or may not disrupt sleep. In most cases, the 77 contours did not extend over or encompass any residential areas in the vicinity of the Airport, and were confined to the Airport itself. The noise contours referred to above were developed pursuant to FAA regulations set out in 14 C.F.R. Part 36, which prescribe that for aircraft certification purposes, aircraft noise is measured at specifically designated locations under prescribed operating and operational conditions, e.g., 6,500 meters from the start of roll for takeoff and 2,000 meters from the runway threshold for approach. Both the data and technology utilized by the FAA's Office of Environment and Energy in the preparation of the noise contours were available prior to August, 1981.

As an alternative to imposing a curfew, there are a number of other means of mitigating and reducing noise from aircraft in and around an airport, including (1) use of reduced power on take-off and landing; (2) preferential runway systems; (3) imposition of noise-level restrictions; (4) altitude restrictions; and (5) designation of arrival and departure routes over less populated areas.

In order to formulate a valid noise compatibility or abatement plan at an airport, it is necessary to monitor noise at the airport for one year, or at the very least, to sample for lesser periods of perhaps 10 days, four times annually, in order to provide a statistically valid sample.

AOPA's analysis of the general aviation aircraft fleet indicates that over 90% of that fleet has a noise level of 75 decibels or less at the FAA prescribed measurement point for takeoff and approach. A more particularized analysis of the aircraft based at the Airport indicates that approximately 90% of these aircraft have a noise level of 75 decibels or less at the FAA prescribed measurement point for takeoff and approximately 70% of them have a noise level of 75 decibels or less at the FAA prescribed measurement point for approach. The weight of the credible evidence presented at trial demonstrates that some aircraft can operate into and out of the Airport without producing noise levels which would interfere with the sleep of the residents in communities in the vicinity of the Airport.

### H. Results of the Curfew

The total ban on flight operations at the Airport between midnight and 7:00 a.m. prevents flights which would have operated during that time period from doing so. Prior to imposition of the curfew on October 1, 1981, the total number of operations at the Airport from 6 a.m. to 7 a.m. was 188 and from 7 a.m. to 8 a.m. was 611. In October, 1981, subsequent to imposition of the curfew banning flight operations from 6 a.m. to 7 a.m., there were 0 flight operations during that hour and 732 flight operations from 7 a.m. to 8 a.m. The County's imposition of a curfew has resulted in delays in departures at the Airport, as well as at LGA, JFK, and EWR, and in congestion and delays along the Solberg route. These delays result from the limited capacity of the air traffic control system in the New York metropolitan area, separation requirements between aircraft, and the limited number of airways and airspace in the area. In short, the curfew has increased congestion and caused a loss of efficiency.

The curfew also caused the termination of contracts between Panorama and various customers in connection with the carriage

of cancelled checks, primarily because Panorama was not able to assure its customers that it could continue to operate at night, due to the curfew. Panorama would be seriously financially impaired and affected in its ability to continue in business if the curfew remained in effect. Additionally, the curfew has caused many AOPA members to cancel trips or adjust travel plans, causing them increased expense and/or delay. Finally, the curfew has had an adverse effect on the corporate and business aircraft based at the Airport, causing the corporations which own and operate those aircraft economic harm, delays, disruption in business scheduling, reduced flexibility, and reduction in the corporations' ability to use aircraft as a business tool. These adverse effects pertain not only to large corporate aircraft owners, but to individual businessmen as well. Flights in and out of other airports are not an adequate substitute for the flexibility provided by business and corporate air flights in and out of the Airport.

## CONCLUSIONS OF LAW

### A. *Jurisdiction*

The Court has jurisdiction over the subject matter of these actions pursuant to 28 U.S.C. §§ 1331, 1337 and 1345.

### B. *Preemption*

■ The FAA has been delegated exclusive responsibility by Congress for the safe and efficient management of the navigable airspace of the United States. *See City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 626–27, 93 S.Ct. 1854, 1856, 36 L.Ed.2d 547 (1973).

The FAA has also been delegated exclusive responsibility for regulating aircraft noise pursuant to the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 *et seq.,* as amended by the Noise Control Act of 1972, 42 U.S.C. §§ 4901 *et seq.,* preempting state and local control. *City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 633, 93 S.Ct. at 1859.

### C. *Lawfulness of curfew*

■ Local airport proprietors such as the County are "vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs." *British Airways Bd. v. Port Authority of New York,* 558 F.2d 75, 84 (2d Cir.1977) ("*Concorde I*"); *see City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 635, 93 S.Ct. at 1860.

■ The curfew on all night flight operations at Westchester County Airport imposed effective October 1, 1981 regardless of accompanying emitted noise is an unreasonable, arbitrary, discriminatory and overbroad exercise of power by the County. *See United States v. State of New York,* 552 F.Supp. 255 (N.D.N.Y.1982), *aff'd,* 708 F.2d 92 (2d Cir.1983); *Concorde I, supra; Air Transport Ass'n of America v. Crotti,* 389 F.Supp. 58 (N.D.Cal.1975).

### D. *Burden on interstate commerce*

■ The curfew has an adverse impact on the flow of interstate air commerce in that it interferes with and prevents the efficient use of the navigable airspace, resulting in a bunching of flights, delays in flights not only at Westchester County Airport but at LGA and other airports in the metropolitan area, and disruption in the flow of air traffic in the New York City metropolitan area. It also adversely affects the operation of the air transportation system in the New York metropolitan area, a system of which Westchester County Airport is a part. *See City of Burbank v. Lockheed Air Terminal, supra; British Airways Bd. v. Port Authority of New York,* 564 F.2d 1002 (2d Cir.1977) ("*Concorde II*"); *Concorde I, supra,* 558 F.2d at 83.

### E. *Exercise of police power*

■ Furthermore, the curfew represents an unlawful exercise of local police power by the County. *Air Transport Ass'n of America v. Crotti, supra,* 389 F.Supp. at 65 ("provisions and regulations of noise levels which occur when an aircraft is in direct

flight, and for the levying of criminal fines for violation, are a per se unlawful exercise of police power into the exclusive federal domain of control over aircraft flights and operation, and airspace management and utilization in interstate and foreign commerce").

### F. Payment of further grant monies

■ The FAA is responsible for the administration and management of the Federal Airport grant-in-aid program under the Airport and Airway Development Act of 1970, as amended, 49 U.S.C. §§ 1701 et seq. (superseded by the Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 2201 et seq.). State of New York v. FAA, 712 F.2d 806 (2d Cir.1983); City of Dallas, Texas v. Southwest Airlines Co., 494 F.2d 773 (5th Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974).

■ The County obligated itself by grant assurances to make the Airport available for public use on fair and reasonable terms, without unjust discrimination, 49 U.S.C. § 1718(1), and at all times, 49 U.S.C. § 1718(5). See, e.g., Concorde II, supra, 564 F.2d at 1011. Failure to comply with the conditions of a grant authorizes the FAA to suspend the grant and withhold further payments, 14 C.F.R. § 152.503(a), and, in the event that corrective action is not taken by the sponsor, to then terminate the grant. 14 C.F.R. § 152.505(a).

The curfew on flight operations at the Airport constitutes a breach of the terms, conditions, and assurances set forth in the grant-in-aid agreements between the County and FAA entered into pursuant to the Airport and Airway Development Act of 1970, as amended, 49 U.S.C. §§ 1701 et seq. The FAA properly refused to pay further grant monies to the County after May, 1983 based on the County's failure to comply with grant conditions and assurances. 49 U.S.C. §§ 2201 et seq.; 14 C.F.R. § 152.-503(a) and § 152.505(a).

### G. Relief

■ Permanent injunctive relief is appropriate where there is irreparable injury, no adequate remedy at law, and, where competing interests are present, the balance of the equities favors the party seeking the relief. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 311–12, 102 S.Ct. 1798, 1802–1803 (1982); Beacon Theatres v. Westover, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954 (1959); Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944).

On the issue of irreparable harm, plaintiffs have demonstrated negative impact on the airspace in the New York City metropolitan area and beyond, which cannot be measured in monetary damages, as well as injury to business and private operations at the Airport. See National Aviation v. City of Hayward, Cal., 418 F.Supp. 417 (N.D.Cal. 1976). There exists no adequate remedy at law for plaintiffs to redress the impact of the curfew on the federally controlled airspace, or the business operations of the corporations using the Airport, or those private individuals who utilize the Airport. City of Burbank v. Lockheed Air Terminal, supra; United States v. State of New York, supra. Finally, the balance of the equities favors granting plaintiffs the relief they seek. Plaintiffs have demonstrated that defendants engaged in no quantification of the nature or extent of a noise problem at the Airport prior to the passage of the subject legislation, nor in any studies prior to enactment indicating that the legislation at issue would specifically address the needs of the residents of the communities in and around the Airport.

A permanent injunction is warranted here inasmuch as the subject legislation falls within an area preempted by Congress, unduly burdens interstate commerce, and is unreasonable, arbitrary, discriminatory and overbroad. City of Burbank v. Lockheed Air Terminal, supra; Concorde I & II, supra; United States v. State of New York, supra.

The County's counterclaim against the United States is dismissed.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

Settle permanent injunction on notice.