**NATIONAL HELICOPTER CORPORATION OF AMERICA, Plaintiff,**

v.

**The CITY OF NEW YORK, The Council of the City of New York, the City Planning Commission of the City of New York, and the New York City Economic Development Corporation, Defendants.**

No. 96 Civ. 3574(SS).

United States District Court,
S.D. New York.

Jan. 7, 1997.

Dewey Ballantine, Donald W. Stever, Janis M. Meyer, Clarke Bruno, New York City, for Plaintiff.

Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, New York City, Deborah Rand, for Defendant.

### AMENDED OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff National Helicopter Corporation of America ("National") brings this action, against the City of New York and various of its subdivisions (the "City"), seeking preliminary and permanent injunctive relief against enforcement of Resolution 1558, a City ordinance setting a variety of restrictions upon the use and operations of the 34th Street Heliport (the "Heliport"). For the reasons to follow, plaintiff's request for a permanent injunction is granted in part, and denied in part.

### BACKGROUND

The Heliport, located on the waterfront adjacent to the FDR drive, was constructed on City owned property in 1972. (Model Aff. ¶ 3). The Heliport has several parking spaces for helicopters; it has no permanent terminal building, no hangar, and no maintenance facilities. In 1972, the City obtained a special permit, effective for a period of five years, authorizing the commencement of operations at the Heliport. In 1973, National and the City entered into a lease, with a ten year term, pursuant to which National became the fixed-base operator of the Heliport. (McGann Aff. ¶ 10). Though its original lease term has expired, National continues to use and operate the Heliport, providing commercial sightseeing and commuter flights, as well as a range of other services. (McGann Aff. ¶ 38).

On March 6, 1996, New York City's City Council enacted Resolution 1558 (the "Resolution"), approving the issuance of a special permit imposing several conditions upon future operations at the Heliport. (Model Aff. ¶ 29; McGann Aff. ¶ 81). The measure requires a 47% reduction in operations at the Heliport, restricts hours of operation throughout the week, phases in a ban on weekend operations, mandates flight paths of sightseeing helicopters, imposes marking requirements on helicopters, and prohibits certain types of aircraft from using the Heliport. (Model Aff. ¶¶'s 26, 29; McGann Aff. ¶¶'s 83, 84). The City's Economic Development Corporation ("EDC") has since incorporated these conditions into a Request For Proposals ("RFP"), issued on May 6, 1996, seeking a new fixed base operator for the Heliport.[1] (McGann Aff. ¶ 92; Model Aff. ¶ 33).

According to plaintiff's current president, Peter McGann, National would suffer significant financial harm if the City were to enforce the Resolution, and if the EDC were to proceed with its RFP. Specifically, Mr. McGann anticipates that the required reductions in operations would precipitate "plummeting" revenues for National, and would result in depleted good will between National and its customers, most notably tour operators and travel agents. (McGann Aff. ¶¶'s 102, 104, 109). More particularly, plaintiff estimates that revenues would decline by roughly $6 million annually, and that—shortly after the start of enforcement—National would be forced to layoff over half of its approximately 200 employees. (Id. ¶¶'s 111, 112). Perhaps most strikingly, Mr. McGann predicts that, if Resolution 1558 is enforced, National "will likely file for bankruptcy." (Id. ¶ 111).

Plaintiff opposes enforcement of Resolution 1558 on the grounds, inter alia, that it was passed in violation of the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, and in violation of the laws of the City of New York. The City responds that National does not have standing to object to the City's enforcement of Resolution 1558, both because plaintiff is subject to eviction at the City's discretion, and because plaintiff has waived any right to pursue whatever claims it might otherwise have. Furthermore, the City contends that the enactment and enforcement of Resolution 1558 amounts to a valid exercise of its proprietary rights in the Heliport.

*Relationship Between The Parties*

National's tenancy at the Heliport has been marked by a variety of disputes and

---

1. By agreement among the parties, all action on the RFP has been stayed pending this Court's determination of plaintiff's request for injunctive relief.

agreements between the parties, several of which have a bearing on the issues presently before the Court. In 1982, approximately nine years after National executed its original ten year lease with the City, the City commenced an action against National claiming that the company was in arrears in its rent. (Model Aff. ¶ 6). The parties settled the matter by a stipulation, dated October 14, 1985. The stipulation included the following provisions: (i) National retroactively exercised its option to renew the lease for a period of ten years, effective October 4, 1983, and (ii) National agreed that it would apply for a special zoning permit for operation of the Heliport, to be issued by the New York City Planning Commission (the "CPC") pursuant to Section 74–66 of the New York City Zoning Resolution.[2] (Model Aff. ¶ 6). In the City's view, the permit was necessary because the original five year permit, obtained by the City in 1972 in connection with the opening of the facility, had expired.

In 1989, in settlement of another rent dispute, National and the City entered into another agreement, this one providing for the cessation of all operations at the Heliport, except for emergency flights, between 11:00 p.m. and 7:00 a.m. (Model Aff. ¶ 7; McGann Aff. ¶ 25). Also, National agreed to resume its diligent pursuit of the special permit application process. Conditioned upon National's satisfaction of its monetary obligations under the lease, and its submission of a duly certified permit application, the City granted National an extension of the lease for a period of two years, with termination of the lease extended to October 3, 1995. (Model Aff. ¶ 7; McGann Aff. ¶ 30).

By 1993, National had commenced work on an Environmental Impact Statement ("EIS") required in connection with its application for the special permit. (Model Aff. ¶ 8). However, the City was not satisfied with National's progress. Accordingly, in connection with yet another rent dispute between the parties, the City—through the EDC—assumed responsibility for completing the EIS, with National committing to reimburse the

City for related costs. (Model Aff. ¶ 8). This April 1, 1993 agreement reiterated that National's tenancy could continue through October 3, 1995, conditioned upon the company's satisfaction of its obligations under the lease. (Model Aff. ¶ 8; Second McGann Aff. ¶ 9).

Shortly after the parties executed the April 1993 agreement, yet another dispute developed regarding the sufficiency of National's rent payments. (Model Aff. ¶ 9; Second McGann Aff. ¶ 10). On July 2, 1993, the City sent National a Notice of Termination of Agreement and Lease Default. (Model Aff. ¶ 9). National responded by bringing a State Court action to prevent the City from accelerating the payments due, and terminating the lease. (McGann Aff. ¶ 11). A January 10, 1994 stipulation, which simply reaffirmed the terms of the April 1, 1993 agreement, proved inadequate to resolve the dispute. The parties subsequently entered into an August 1994 stipulation, which included a waiver by National of any claims which it could have raised in the 1993 State Court action, as well as any claims relating to the "EDC's acts or omissions" in connection with the special permit application. (Second McGann Aff. ¶ 19).

By June of 1995, it became clear that a special permit would not issue until after the contemplated and agreed upon October 3, 1995 termination date of National's tenancy at the Heliport. (Second McGann Aff. ¶ 25). Accordingly, the parties negotiated and agreed upon another stipulation—this one executed on February 13, 1996—providing for: (i) National's continued tenancy at the Heliport, on a month-to-month basis, until July 31, 1996; (ii) an immediate issuance of an Order of Ejectment which could be executed and enforced on July 31, 1996, without further notice to National; (iii) an agreement by National not to commence any suit or proceeding or to bring any order to show cause to vacate the judgment of possession or to stay execution thereof; and (iv) an agreement by National to:

---

**2.** The Zoning Resolution regulates "the location of trades and industries and the location of buildings designated for specific uses within the City of New York." (Model Aff. ¶ 4). Pursuant to

Section 74–66, the CPC may regulate "construction, reconstruction or enlargement of heliports." (Stever Aff.Ex. B).

... waive any and all claims, counterclaims and defenses they may have, including those which were raised or which could have been raised in this action, and Defendants' obligations relating to the Documents with respect to EDC's acts or omissions regarding the EIS (including any modifications), the ULURP application, or any conditions relating to the special permit required under the City's Zoning Resolution for operating the Heliport.

(Model Aff. Ex. F). It is this language, adopted approximately one month prior to the passage of Resolution 1558, which—in the City's view—amounts to a waiver by National of any claims it might have relating to that Resolution.

*Adoption Of Section 1558*

As the preceding discussion suggests, many of the events bearing upon the relationship between National and the City related also to the regulatory status of the Heliport—*i.e.*, whether it was operating under a valid special permit. As noted, National continued its operations at the Heliport after the expiration of the special permit secured by the City in 1971, but agreed—pursuant to the 1985 stipulation between the parties—to submit an application for renewal of the permit. As part of the stipulation, National assumed responsibility for obtaining the EIS that was required in connection with the application process. Under the 1993 stipulation between the parties, however, the City assumed responsibility, under the auspices of the EDC, for the EIS, with National agreeing to reimburse the City for the related costs.

On June 29, 1995, the EDC and the Department of Business Services ("DBS"), filed, as co-applicants, an application for a special permit for the Heliport (the "Application") with the City Planning Commission ("CPC"). (McGann Aff. ¶ 73; Model Aff. ¶ 20). The Application set forth the City's goal of redistributing tourist sightseeing flights from the Heliport to other City heliports and of limiting the number of these flights to achieve a 47% reduction in the total number of helicopter operations at the Heliport. (Model Aff. Ex. K). Submission of the Application triggered the Uniform Land Use Review Procedure ("ULURP") process, which occurs in connection with significant land use decisions. (Model ¶ 11; McGann Aff. ¶ 76).

As part of the ULURP process, the CPC certified the EDC's Application as complete on August 7, 1995. (Model Aff. ¶ 21; McGann Aff. ¶ 77). A draft EIS had been certified complete only days earlier, on August 4, 1995. (Model Aff. ¶ 11). On November 29, 1995, the CPC conducted a public hearing for consideration of the Application and the EIS. (McGann Aff. ¶ 78; Model Aff. ¶ 23). One month later, on or about December 29, 1995, the final EIS relating to the Application was certified as complete. (McGann Aff. ¶ 79; Model Aff. ¶ 11). The EIS ostensibly served to provide empirical support for those conditions contemplated by the EDC and the CPC in connection with operations at the Heliport. (Model Aff. Ex. G).

The final EIS anticipates and assesses the impact to follow from the 47% reduction in Heliport operations provided for in the EDC's application for a special permit. Large sections of the document are devoted to background information, describing the Heliport, and the extent and nature of its operations over time. The report also details the nature of the surrounding community, both as it exists, and as the City anticipates its development. With respect to noise, the EIS describes significant differences between decibel levels during "peak" hours and on "average." (Model Aff. Ex. G at S–7). Both conditions, it was determined, "result in significant noise impacts." (*Id.*). With respect to mitigating peak impacts, the EIS explores various alternatives, but concludes that: "[t]here are no economically feasible measures that can be implemented to reduce intrusive peak helicopter flyby noise levels within acceptable levels." (*Id.* at S–13). The EIS does conclude, however, that the EDC's proposed reductions in operations would result in lower noise levels, both in magnitude and significant impact. (*Id.* at S–7).

On January 9, 1996, the CPC issued its decision recommending that the special permit Application be granted, and that a variety of restrictions be imposed upon operations at the Heliport. (McGann Aff. ¶ 80;

Model Aff. ¶ 24). On March 6, 1996, following a public hearing assessing the CPC's conclusions, the City Council enacted Resolution 1558, which adopted certain of the CPC's recommendations, and modified others. (McGann Aff. ¶ 81). The City Council incorporated fully the following conditions recommended by the CPC:

 a. Weekday operations at the Heliport restricted to between 8:00 a.m. and 8:00 p.m.

 b. A minimum 47% reduction in operations at the Heliport.

 c. Tourist flights prohibited from flying over Second Avenue, and north-south sightseeing flights restricted to the East and Hudson rivers.

(McGann Aff. ¶ 83; Model Aff. ¶ 26). The City Council also enacted the following provisions, which modified certain CPC recommendations:

 d. Saturday and Sunday tourist operations restricted to between 10:00 a.m. and 6:00 p.m., and ultimately, to be phased out entirely.

 e. Sikorsky S–58T, or helicopters of a similar size, barred from using the Heliport for sightseeing operations.

 f. All helicopters using the Heliport to be marked for identification from the ground.

(McGann Aff. ¶ 84; Model Aff. ¶ 29). The restrictions set forth in Resolution 1558 have been incorporated into the RFP issued by the EDC on May 6, 1996.[3] (McGann Aff. ¶¶'s 88, 92; Model Aff. ¶¶'s 33, 36).

### DISCUSSION
### INJUNCTIVE RELIEF

■ To obtain a preliminary injunction, "[t]he moving party must show (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.

1992); *see also Richard Feiner & Co., Inc. v. Turner Entertainment Co.,* 98 F.3d 33, 34 (2d Cir.1996). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction with the exception that the plaintiff must actually succeed as to the merits rather than merely make a showing that such success is likely in a future proceeding. *See Clarkson v. Coughlin,* 898 F.Supp. 1019, 1035 (S.D.N.Y.1995) (citing *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1993)).

■ Though plaintiff initially applied for a preliminary injunction in this matter, the parties agreed, at oral argument, that the record before the Court is sufficiently complete to permit a final decision on the merits. (Tr. of October 18, 1996 Oral Argument at 8). Accordingly, this Court exercises its discretion to treat this matter as a trial, and converts plaintiff's application into one for permanent injunctive relief. *See* Fed.R.Civ.P. 65(a)(2).

### I. IRREPARABLE HARM

#### A. Damage To Business

■ "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Intern., Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (reversing district court, and granting injunctive relief prohibiting supplier of foreign news photographs from terminating service provided to plaintiff wire service) (citations omitted). A "substantial loss of business," particularly where there is a threat of bankruptcy, constitutes irreparable injury sufficient to satisfy this standard. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *see also Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1186 (2d Cir.1995) ("Major disruption of a business can be as harmful as its termination and thereby constitute irrepara-

---

**3.** Under the terms of the RFP, only the Heliport base operator is required to satisfy the markings requirement, to fly the established sightseeing routes, and to refrain from using the S–58T or

equivalent aircraft. (Model Aff. ¶ 37). The required reduction in operations and the curfew set forth in the Resolution will apply to the base provider and facility users alike.

ble injury."), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). The threat that a business will suffer a significant loss of "good will"—a matter not easily quantified—is particularly suited to a claim for injunctive relief. *See, e.g., Reuters,* 903 F.2d at 907–08; *see also Blue Sky Entertainment, Inc. v. Town of Gardiner,* 711 F.Supp. 678, 697 (N.D.N.Y.1989) ("monetary damages would be difficult to measure in any related action for loss to business reputation").

According to plaintiff's current president, Peter McGann, the 47% reduction in operations at the Heliport contemplated under Resolution 1558 will cause National's revenues to "plummet" and will necessitate "dramatic" changes in the Company's operations. (McGann Aff. ¶ 102). Moreover, because the Resolution will require National to eliminate certain of its services and all of its operations during certain hours, Mr. McGann anticipates that the City's enforcement of Resolution 1558 will result both in lost revenues to National and in damage to National's reputation and good will with its present and prospective clientele. (*Id.* ¶¶'s 104, 107, 109). In more concrete terms, plaintiff predicts losses of roughly $6 million annually (with expenses exceeding revenues by $3.5 million per year), layoffs of over half of the company's approximately 200 employees, and, ultimately, bankruptcy. (*Id.* ¶¶'s 111, 112).

The City's suggestion that plaintiff's anticipated losses are too speculative to support a claim for injunctive relief is unavailing. As a matter of logic, it cannot be speculative for plaintiff to predict significant business losses resulting from the enforcement of a resolution which, on its face, mandates a significant reduction in business. Indeed, this is precisely what Resolution 1558 does; the City's express goal in enacting the Resolution is to achieve a 47% reduction in operations at the Heliport by eliminating certain services and by restricting hours of operation. The City's 8:00 p.m. to 8:00 a.m. curfew, the elimination of weekend operations, and the assorted other conditions incorporated into Resolution 1558 and the RFP, can be expected to have their intended effect, and undoubtedly will cause National significant and irreparable injury in its future operations at the Heliport.

The relevant case law reinforces this finding; several courts have granted injunctive relief in favor of plaintiff airport users and operators confronted with less severe restrictions upon their operations than those now confronting National. *See, e.g., United States v. State of New York,* 552 F.Supp. 255 (N.D.N.Y.1982) (enjoining state's enforcement of an 11:00 p.m. to 7:00 a.m. curfew), *aff'd,* 708 F.2d 92 (2d Cir.1983); *United States v. County of Westchester,* 571 F.Supp. 786 (S.D.N.Y.1983) (enjoining county's enforcement of a 12:00 p.m. to 7:00 a.m. curfew); *San Diego Unified Port District v. Gianturco,* 651 F.2d 1306 (9th Cir.1981) (enjoining state's effort to expand, by two hours, curfew already adopted and enforced by airport proprietor), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).

### B. National's Status As A Holdover Tenant

According to the City, plaintiff's predictions concerning the likely impact of Resolution 1558 cannot be credited because those predictions presuppose that National will continue in its status as the fixed base operator at the Heliport. As defendant argues, this assumes too much; pursuant to the February 1996 agreement executed between the parties, as of July 31, 1996, National has been subject to eviction at the City's discretion. Moreover, the City is now prepared to move forward with an RFP seeking a new fixed base operator for the Heliport. As the City sees it, National cannot demonstrate that Resolution 1558 will impair its operations at the Heliport, because there is no assurance that National is otherwise entitled—or even likely—to continue in its operations at the Heliport.

The City is right that Mr. McGann's initial submission glosses over the tenuous nature of National's status as tenant at the Heliport. The City is guilty of an oversight of its own, however. As plaintiff points out in its Reply Memorandum In Support Of Motion For A Preliminary Injunction (the "Reply"), the City ignores the fact that National's interest in the Heliport extends beyond its status as the fixed base provider. However precarious plaintiff's status as the tenant of the Heli-

port, National will remain free to operate as a user of the Heliport into the foreseeable future. (Reply at 10). National's use tends to be extensive: National, in its own name, is responsible for 8% of operations at the Heliport, and, in combination with its wholly owned subsidiary, Island, accounts for 84% of operations at the Heliport. (Second McGann Aff. ¶¶'s 35, 36). As a regular user of the Heliport, plaintiff will be subject to—and affected by—the curfew and the mandatory reduction in operations set forth in Resolution 1558, as incorporated into the RFP.

■ In his second affidavit submitted in support of plaintiff's Reply Memorandum, Mr. McGann addresses the extent of the impact that Resolution 1558 would have upon National specifically in its capacity as a user of the Heliport. Even in the event that another company replaces National as the fixed base provider, Mr. McGann predicts that the Resolution will cause National a decline of more than $4 million in gross revenues.[4] (Second McGann Aff. ¶ 46). National has provided the Court with affidavits from a sampling of its customers—cumulatively responsible for $1.5 million of the company's revenues—all attesting to their intention to discontinue doing business with National in the event that the Resolution goes into effect. (*See* Exhibits to Bruno Affidavit). This same brand of evidence—affidavits from wary customers—has been deemed persuasive in support of a request for injunctive relief by the Court in *State of New York*, 552 F.Supp. at 261–62 ("There is no requirement in this Circuit that a party wait until near-extinction before moving for a preliminary injunction. The law, like the Constitution, is not a suicide pact."). In view of the proffered evidence, as well as the applicable case law, the Court is satisfied that Resolution 1558 will cause National irreparable injury—at a minimum—in its capacity as a regular user of the Heliport. *Id.; see also County of Westchester*, 571

F.Supp. at 788 (granting injunctive relief on behalf of regular users of Westchester County Airport challenging a curfew imposed on operations).

## II. THE MERITS

### A. Waiver

Relying upon the stipulation executed between the parties in February 1996, defendants argue that plaintiff cannot prevail on its claims because it has waived any rights it might otherwise have to challenge the conditions set forth in the Resolution. The stipulation provides:

> Plaintiffs waive any and all claims, counterclaims and defenses they may have, including those which were raised or which could have been raised in this action, and Defendants' obligations relating to the Documents with respect to EDC's acts or omissions regarding the EIS (including any modifications), the ULURP application, or any conditions relating to the special permit required under the City's Zoning Resolution for operating the Heliport.

(Model Aff. Ex. F at 5). According to the City, this provision is "clear": National knowingly waived its right to challenge "any conditions" which might ultimately be incorporated into "the special permit required under the City's Zoning Resolution for operating the Heliport." (Defendants' Memorandum of Law In Opposition to Plaintiff's Motion for a Preliminary Injunction at 9).

■ To the extent that a party plainly waives its rights to pursue a cause of action, that waiver—in the absence of exceptional circumstances—will be binding in future proceedings. *See Middle East Banking v. State Street Bank Intern.*, 821 F.2d 897, 906 (2d Cir.1987) (upholding validity of release against claim of unilateral mistake). However, "the meaning and coverage of a release depends on the controversy being settled, and ... a 'release may not be read to cover

---

4. As noted, the case law confirms that when a business is threatened with such significant losses, a monetary award is inadequate and injunctive relief may be warranted. *See Doran*, 422 U.S. at 927, 95 S.Ct. at 2565; *see also Petereit*, 63 F.3d 1169. The Eleventh Amendment to the United States Constitution would, in any event,

bar plaintiff from obtaining monetary relief, in federal court, against the City. *See United States v. State of New York*, 708 F.2d 92 (2d Cir.1983). For this independent reason, then, plaintiff's likely injuries cannot be addressed except through injunctive relief. *Id.*

matters which the parties did not desire or intend to dispose of.'" *Gettner v. Getty Oil Co.,* — A.D.2d ——, 641 N.Y.S.2d 73, 74 (2d Dept.1996) (citations omitted); *see also City of New York v. State of New York,* 40 N.Y.2d 659, 389 N.Y.S.2d 332, 340, 357 N.E.2d 988, 995–96 (1976). Moreover, "[t]his intent must be clearly established and cannot be inferred from doubtful or equivocal ... language, and the burden of proof is on the person claiming the waiver of the right." *East 56th Plaza, Inc. v. Abrams,* 91 A.D.2d 1129, 458 N.Y.S.2d 953, 955 (3d Dept.1983). If the waiver in this action is susceptible to more than one interpretation, then, the Court will reject defendants' broader interpretation "absent a clear manifestation of intent." *See Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 662 (2d Cir.1994).

"[T]he controversy being settled" by the stipulation was, in essence, one in a series of rent disputes. *Gettner,* 641 N.Y.S.2d at 74. It was in resolution of an earlier one of these disputes that the EDC assumed responsibility for pursuing the special permit Application process, with National agreeing to reimburse the EDC its costs. As defendant notes, by the time the February 1996 waiver was executed, the CPC had already issued its January resolution approving the EDC's application for a special permit subject to conditions including a 47% reduction in operations at the Heliport, an 8:00 a.m. to 8:00 p.m. curfew, reduced weekend hours, and a ban on tourist flights over Second Avenue. However, as plaintiff notes, Resolution 1558 had not yet been passed, and the ULURP process was ongoing. Thus, while plaintiff may well have been aware of the CPC's recommendations, plaintiff could not have known which, if any, conditions ultimately would be enacted. It is against this backdrop, one involving a rent dispute and an ongoing ULURP process, that the stipulation was executed. When considered in this context, the particular language of the stipulation, and the likely intent of the parties, is most readily discerned, and certain, but not all, of National's arguments challenging Resolution 1558 and the RFP fail.

### 1. National's City Law Claims

At a minimum, by the terms of its stipulation, plaintiff accepted that a "special permit" is "required under the City's Zoning Resolution for operating the Heliport," and acquiesced to the process undertaken by the City in connection with securing that permit, ostensibly on plaintiff's behalf. Specifically, under the terms of the stipulation, National expressly waived any claims challenging the "EDC's acts or omissions" in connection with; (i) the EIS, (ii) the ULURP Application, or (iii) any conditions relating to the special permit. In other words, plaintiff has accepted both the need for a special permit and the procedural requirements for obtaining it, and has agreed to forego any claims challenging the EDC's conduct (*i.e.,* "acts or omissions") in these regards.

By its acceptance of the ULURP process and the EDC's related conduct, National waived its right to pursue its claim that the requirement for a special permit and the manner in which Resolution 1558 was passed were all in violation of City law. It is perfectly understandable that such a waiver would grow out of the circumstances prompting the stipulation. The City had undertaken the Application process that National had initiated, and clearly sought to avoid any suit by National challenging the legitimacy of that process, the need for a permit, or the adequacy of the City's efforts. In exchange for an extension of the period of its tenancy, National provided this waiver. Because the Resolution was passed pursuant to the exact process outlined and authorized by the express terms of the waiver, National is barred from advancing its current claim that the Application process undertaken by the EDC, culminating in permit approval by the City Council, was illegitimate under City law.

### 2. National's Constitutional Challenge

While plaintiff's waiver precludes it from challenging the need for a special permit, the Court does not interpret the waiver to bar plaintiff from raising a substantive challenge—particularly one of constitutional magnitude—to any conditions ultimately adopted by the City Counsel in connection with that permit. As already noted, the

applicable rules of construction, require that courts apply waivers narrowly. This requirement is heightened with respect to the alleged waiver by National of its Supremacy Clause challenge. First, the Court is reticent to interpret the language of the stipulation to affect a waiver of a constitutional claim founded in the public's interest in a safe and uniform system of aviation. *Cf. Summit School v. Neugent,* 82 A.D.2d 463, 442 N.Y.S.2d 73, 77 (2d Dept.1981) (reasoning that even a clear waiver of a "right concern[ing] a matter of public policy" is ineffective). Second, contract language must be especially clear to the extent that it is meant to waive claims not yet available at the time the instrument is executed. *See Schneider v. Revici,* 817 F.2d 987, 993 (2d Cir.1987) ("Though this language can be interpreted to mean that the patient is agreeing not to bring suit for any consequences that may arise in the future ... that interpretation is not compelled."). National's constitutional challenge is such a claim: by the time National agreed to the terms of the stipulation, the ULURP process was well advanced, and presumably susceptible to the City law challenge which, as the Court has determined, National has waived; the process was not yet complete, however, and National could not then have pursued the Supremacy Clause challenge now before the Court. *See Williamson Cty. Regional Planning Comm'n. v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985) (holding that because party seeking relief under the Taking Clause had "not yet obtained a final decision regarding the application of the zoning ordinance ... to its property ... [its] claim [wa]s not ripe.").

Contrary to the City's contention, the language of the stipulation in no way "compels" the conclusion that National waived its right to challenge, on constitutional grounds, the conditions set forth in the Resolution. The waiver language concerning the "conditions relating to the special permit" does not stand alone; it must be read in conjunction with the language addressing "Defendants' obligations" and the "EDC's acts or omissions." Through the combined operation of these phrases, plaintiff accepted that a special permit might ultimately include certain conditions, and agreed not to pursue any claims assailing the EDC for its "acts or omissions" in connection with recommending or vetting the various possibilities. The stipulation should not be read, however, to include an absolute waiver by plaintiff of its right to challenge, on a substantive basis, the constitutionality of those conditions finally adopted.

In sum, defendant reads the stipulation too broadly, particularly in light of the imperative that waivers be interpreted narrowly, with any ambiguities resolved in favor of the noninvoking party. While the stipulation bars plaintiff from challenging the need for a special permit—one which might include certain conditions—the stipulation does not provide the City with license to enact whatever conditions it desires, constitutional or not. Put differently, plaintiff waived its right to challenge the need for a permit and the legitimacy or adequacy of the process undertaken by the City in connection with obtaining it, but plaintiff did not waive its right to challenge the substance of any permit ultimately secured. Therefore, plaintiff is barred from arguing that a special permit, whatever its provisions, cannot be required consistent with New York law, but plaintiff is entitled to proceed with its claim that the substance of Resolution 1558 improperly intrudes into an area preempted under federal law.

## B. Preemption

The Supremacy Clause of the Constitution preempts state laws that "interfere with or are contrary to laws of Congress." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (citations omitted). Preemption can arise in any one of three ways. First, "Congress may preempt state law by an express provision." *New York Airlines, Inc. v. Dukes County,* 623 F.Supp. 1435, 1441 (D.Mass.1985). Second, "field preemption" occurs where "the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Gade v. National Solid Wastes Management Assoc.,* 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d

73 (1992) (citations omitted). Finally, "conflict preemption" applies "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citations omitted).

In support of its claim that Resolution 1558 is preempted by federal law, National invokes the Federal Aviation Act ("FAA"), 49 U.S.C. § 40101, *et seq.*, the Noise Control Act ("NCA"), 49 U.S.C. § 44715, *et seq.*, the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq.*, and the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. § 47101, *et seq.* National refers the Court to language in the FAA by which Congress expressly preempts any state laws which relate to the "price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The remaining statutes are offered in support of a more general claim of implied preemption. That is, plaintiff seeks to demonstrate that there is such overarching federal control in the aviation field that there simply is no room remaining for the City's regulatory involvement.

Defendants accept that Resolution 1558 would be preempted under federal law if it was enacted solely pursuant to the City's police power. Defendants argue, however, that preemption does not apply here because the City enacted Resolution 1558 pursuant to its legitimate interests as the proprietor of the Heliport. The City's position is informed by the Supreme Court's discussion of preemption in *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). In *Burbank,* the Supreme Court set out the full extent of federal preemption in the aviation field, and suggested the possibility of the proprietor exception upon which defendants now rely. *Id.*

The Court in *Burbank* held that a curfew, adopted by the City of Burbank, prohibiting flights by jet aircraft between 11:00 p.m. to 7:00 a.m. at the Hollywood–Burbank Airport was unconstitutional, under the Supremacy Clause, because it was preempted by the FAA and the NCA. Upon examining these enactments, and assessing the regulatory authority allotted to various federal agencies over aviation matters, the Court determined that Congress had asserted its "full control

over aircraft noise, preempting state and local control." *Id.* at 633, 93 S.Ct. at 1859. In the Court's view, any local regulation over aircraft operations contravened Congress' plain determination that safety and efficiency in aviation "requires a uniform and exclusive system of federal regulation ..." *Id.* at 639. The Court's pronouncements have since been understood to extend well beyond curfews; indeed, a large variety of restrictions upon aircraft operations—including many akin to those announced by Resolution 1558—have been deemed unconstitutional under the Supremacy Clause. *See, e.g., British Airways Brd. v. Port Authority of New York and New Jersey ("Concorde II"),* 564 F.2d 1002 (2d Cir.1977) (preempting prohibition on airport use by particular aircraft); *United States v. City of Blue Ash,* 487 F.Supp. 135 (S.D.Ohio 1978) (preempting route restrictions), *aff'd,* 621 F.2d 227 (6th Cir.1980).

The *Burbank* decision, in a footnote, suggested that different logic—and different results—might apply with respect to regulations imposed by a city acting in its capacity as an airport proprietor. Declining to consider "what limits, if any, apply to a municipality as a proprietor," the Court identified certain legislative materials suggesting that a municipality, in its capacity as a proprietor, should be granted unspecified leeway in enacting restrictions upon air carriers. *Burbank,* 411 U.S. at 635–36, n. 14, 93 S.Ct. at 1860–61, n. 14. Specifically, in correspondence concerning the enactment of the NCA, the Secretary of Transportation expressed his view that the legislation would not affect the existing rights of "[a]irport owners acting *as proprietors* [to] deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory." *Id.* (emphasis supplied by the Court). After *Burbank,* Congress codified this view with a provision in the FAA providing that municipalities retain their "proprietary powers and rights." *See* 49 U.S.C. § 41713. Though neither Congress nor the Supreme Court has delineated the precise nature of the "powers and rights" reserved to proprietors, "[t]he rationale for this exception is clear. Because airport proprietors bear monetary liability for excessive

aircraft noise under *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), fairness dictates that they must also have power to insulate themselves from that liability." *San Diego Unified Port District,* 651 F.2d at 1316–17.

Following *Burbank,* the federal courts have recognized complete federal preemption over the regulation of aircraft and airspace, with a "limited role for local airport proprietors in regulating noise levels at their airports." *See City and County of San Francisco v. F.A.A.,* 942 F.2d 1391, 1394 (9th Cir.1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1665, 118 L.Ed.2d 387 (1992). That "limited role" is one in which municipalities can regulate aircraft operations in a "fair, reasonable, and nondiscriminatory" manner. *See British Airways Bd. v. Port Authority* ("*Concorde I*"), 558 F.2d 75, 82 (2d Cir.1977). Thus, the relevant inquiry for the Court is two-fold. First, it is necessary to determine whether the City of New York is the proprietor of the Heliport; if it is not, Resolution 1558 must be struck down as unconstitutional. Next, if the City is the Heliport proprietor, it is necessary to determine whether the conditions set forth in Resolution 1558 nevertheless extend beyond the scope of appropriate proprietary considerations and actions.

### 1. The City As Proprietor

As noted, the proprietor exception is meant to permit a municipality the flexibility needed to avoid liability in connection with its control over an airport. *See State of New York,* 552 F.Supp. at 264; *see also Blue Sky Entertainment,* 711 F.Supp. at 695 n. 16. In support of its position that the City possesses no such proprietary stake in the Heliport, National relies upon the indemnification provision contained in the original lease between the parties:

> Lessor shall be held harmless and Lessor shall not be liable for any damage, injury, or liability that may be sustained by Lessee or any other person whatsoever or to its goods and chattels from any cause whatsoever, arising from or out of the occupancy, use or operation as a heliport, of the demised property . . .

(McGann Aff. Ex. C at 18). According to National, by so contracting away its potential liability in connection with operations at the Heliport, the City relinquished its interests as the facility's proprietor. In the City's view, this indemnification provision cannot destroy its interest as the proprietor of the Heliport; it is a provision effective only as between the parties, and therefore it does not adequately insulate the City from liability arising from claims brought against it by outsiders to the agreement.

National refers the Court to a pair of decisions which stand for the proposition that a municipality which rids itself of any potential for liability in connection with the operations of an airport thereby surrenders any proprietary right that it might otherwise have to enforce regulations affecting operations at that airport. *See Pirolo v. City of Clearwater,* 711 F.2d 1006 (11th Cir.1983); *San Diego Unified Port District,* 651 F.2d 1306. In *Pirolo,* the Eleventh Circuit affirmed a district court ruling striking down a curfew, and various route restrictions, enacted by the city of Clearwater in connection with operations at a local airport run by the plaintiff pursuant to the terms of a long term lease entered into with the city. In arriving at its holding, the Court expressly declined to pass upon whether the city was the airport proprietor. Instead, referring to the lease entered into between the city and the plaintiff, the Court determined that the city "contracted away its right to impose the desired restrictions." *Pirolo,* 711 F.2d at 1009. Thus, contrary to plaintiff's suggestion, the Court in *Pirolo* did not find that the state was not in fact the airport proprietor because of the indemnification provision, but only that it had failed to reserve for itself, by contract, the right to exercise certain of its proprietary functions.

In *San Diego Unified Port District,* the Ninth Circuit upheld a lower court ruling that California was preempted from imposing a curfew restricting operations at an airport operated by the San Diego Unified Port District. Addressing the state's contention that its action was permitted pursuant to the proprietor exception, the Court focused upon "California's extensive grant of powers to the

Port District." *San Diego Unified Port District*, 651 F.2d at 1318. By vesting in the Port District "every earmark of proprietorship," the state legislature effectively "passed any potential aircraft noise liability" to the Port District. *Id.* at 1318–19. Thus, by operation of state law, the Ninth Circuit concluded that California could not be deemed the airport proprietor, and was not entitled to impose any restrictions upon operations at the facility.

In key respects, the situation presently at issue is unlike the situations addressed by the Courts in *Pirolo* and *San Diego Unified Port District.* In *Pirolo*, as noted, the Court never passed upon whether the city was the airport proprietor, but determined instead that—even if the city was the proprietor—it had not retained its proprietary rights under the terms of its lease agreement with plaintiff. In this case, however, the lease between the parties expressly provides that National will be "subject to the terms, conditions or requirements of any existing or future license to operate an airport for helicopters ... at or on the demised premises issued by the Commissioner or any other Agency of the Federal, State or City Government having jurisdiction." (Model Aff. Ex. B at 4). For present purposes, then, the lease reserved for the City the right to incorporate into a special permit any proprietary conditions upon operations at the Heliport otherwise authorized under law.[5] Thus, unlike in *Pirolo*, to the extent that the City is the Heliport proprietor, the City has reserved its right to enforce regulations in its capacity as such.

In *San Diego Unified Port District*, where the city was deemed not to be the airport proprietor, the city did not simply contract away its proprietary interests in the airport, but enacted legislation relieving it of any potential liability relating to operations at the airport. That is, all potential claimants were barred by law from pursuing claims against the city, and were, in essence, directed to the airport operator for the redress of any ac-

tionable grievances. Here, however, the indemnification clause is effective, if at all, only as between National and the City. There is no basis for concluding that any party otherwise disposed to sue the City in connection with noise or other Heliport related claims would forego those claims against the City, or be barred from pursuing these claims, because of the indemnification provision between the City and National. In fact, the parties recognized as much when they executed the lease; at the same time it provides for National's indemnification to the City for any claims, the lease also requires that National provide the City with liability insurance—up to designated, limited amounts—from which the City can obtain funds to pay any damages award against it. (McGann Aff. Ex. C at 9). Thus, as can be detected on the face of the lease, there is no basis for supposing that the indemnification provision between the parties is effective to relieve the City of the risk of liability attendant to being the Heliport proprietor.

In short, neither of the cases upon which National relies provides adequate support for its position that the City is not the proprietor of the Heliport. In fact, the situation at hand is most closely analogous to the one scrutinized by the Ninth Circuit in *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977 (9th Cir.1991) (striking portions of noise control ordinance on due process grounds). There, the Ninth Circuit assessed a noise control ordinance, passed by the City of Long Beach, limiting the number of flights permitted at the Long Beach Municipal Airport. The ordinance included the following indemnification provision: "Commencement of flight operations at Long Beach airport shall be deemed to constitute an undertaking to indemnify the City of Long Beach for any judgment for nuisance, noise, inverse condemnation or other damages awarded against the City as a result of flight operations ..." *Id.* at 982. Reasoning that this language "merely establishe[d] a right of re-

---

5. Given that the lease between National and the City has expired, and given that the City is prepared to move forward with an RFP, plaintiff's reliance upon the lease is—in any event—short sighted. Even if the City had contracted away its proprietary interest in the Heliport, this is a matter which the City could be expected to cure in short order by operation of its RFP, which has the City's desired conditions built in.

covery for damages actually awarded against the city," the Court determined that the city was the airport proprietor. *Id.* On this same basis, the indemnification provision contained in the lease between National and the City is insufficient to divest the City of its proprietary interests in the Heliport.

■ National further argues, however, that even if the City is the Heliport proprietor—as the Court has determined it to be— the City was not acting in its capacity as such when it enacted Resolution 1558. Instead, as National notes, the City passed the Resolution specifically pursuant to its zoning authority, a quintessential exercise of its police power. This characterization, though accurate so far as it goes, is incomplete; it ignores that the City "may act in both a proprietary and a governmental capacity." *See State of New York*, 552 F.Supp. at 264. It is true that the City Council's adoption of the special permit, pursuant to Section 74–66 of the Zoning Resolution, implicates the City's police power. However, the EDC undertook a proprietary role in matters by acting as the Heliport landlord, by its extensive involvement in the Application process, and by its issuance of an RFP. *See San Diego Unified Port District*, 651 F.2d at 1317 (identifying such factors as ownership, promotion, and leasing as consistent with municipality's status as proprietor). In short, the imposition of conditions upon operations at the Heliport reflects a multifaceted process, and those conditions were settled upon by a complex entity (*i.e.*, the City with its many subdivi-

sions). It would be inappropriate, if not impossible, to hold the City to having acted in one of its capacities or another, and to rule upon the disputed conditions on that basis. *See State of New York*, 552 F.Supp. at 264 (determining that while the state may have acted, to some extent, for "political and economic reasons," its enactment of an airport curfew should be evaluated under the reasonableness standard governing proprietors). For purposes of applying the proprietor exception, then, it suffices that the City's enactment of Resolution 1558 "was an act of a proprietor." *Id.*

### 2. The Reasonableness Of The Resolution

■ The Second Circuit has identified "an extremely limited role" reserved by Congress "for airport proprietors in our system of aviation management." *Concorde II*, 564 F.2d at 1010. Local airport proprietors such as the City are "vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs." *Concorde I*, 558 F.2d at 84; *see also County of Westchester*, 571 F.Supp. at 797. Moreover, to avoid "even the appearance of whim and caprice" in matters of airport access, the Court must "carefully scrutinize" any conditions imposed by the City in its capacity as proprietor to insure that this reasonableness standard is met.[6] *See Concorde II*, 564 F.2d at 1005, 1011.

---

**6.** The Court's resolution of National's Supremacy Clause claim renders it unnecessary to devote any separate consideration to plaintiff's challenges under the Equal Protection Clause and the Commerce Clause. Under the Equal Protection Clause, the City's regulations are constitutional so long as they are supported by some rational basis. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976). As plaintiff's counsel agreed during oral argument on this matter (Tr. of October 18, 1996 Oral Argument at 56), the rational basis test is less rigorous than the "reasonableness" test articulated by the Second Circuit in *Concorde*. *See City & County of San Francisco v. F.A.A.*, 942 F.2d 1391, 1397 (9th Cir.1991). Thus, if the regulations are reasonable such that they pass muster under the preemption analysis, they necessarily satisfy the requirements of Equal Protection.

Similar considerations direct the Court in its treatment of National's Commerce Clause challenge. The Resolution violates the Commerce Clause only to the extent that it intrudes upon an area reserved for Congressional control. *See White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."). A finding that defendants have acted properly as proprietors amounts to a finding that defendants have acted in a manner approved of by Congress. *See Concorde I*, 558 F.2d at 84 n. 2 ("Congress has consciously committed to airport owners the responsibility of determining permissible levels of noise for the facility and its environs."). Therefore, if the City acted appropriately in its capacity as proprietor, it did not violate the Commerce Clause.

As the *Concorde* standard has come to be applied in a variety of factual settings, courts have determined that the proprietor exception cannot be limited strictly to regulations dealing with noise. Municipalities as proprietors are more broadly entitled to "deal with noise and other environmental problems at the local level." *See Western Air Lines v. Port Authority,* 658 F.Supp. 952 (S.D.N.Y. 1986), *aff'd,* 817 F.2d 222 (2d Cir.1987). For instance, the municipal owner of an airport is uniquely situated to address such concerns as ground congestion, and must therefore be granted some leeway, under the proprietor exception, in this area. *Id.* However, the rule announced in the *Concorde* decisions strictly limits the leeway to be permitted: any regulations undertaken pursuant to the exception—whatever the proprietary interest involved—can be upheld only upon close scrutiny of the underlying rationale, and the factual underpinnings, for the specific measure undertaken.

a) Required Reductions In Operations

Resolution 1558 is not focused upon limiting operations at the Heliport during the busiest times of day, the morning and afternoon rush hours. (Model Aff.Ex. G at II.B–9). The City has opted instead to set a nighttime curfew, a ban on weekend operations, and a 47% reduction on overall services. As the City explains it, these provisions were not meant to reduce the loudest noise levels at the Heliport, but to reduce cumulative noise levels by restricting total operations at the facility. In support of its selected approach, the City relies upon the decision in *Global International Airways Corp. v. Port Authority of New York And New Jersey (Global I),* 727 F.2d 246 (2d Cir.1984) (rejecting "facial" challenge to regulation dictating the mix of craft—based upon their noise characteristics—permitted to operate at airport).

In *Global I,* the Second Circuit held that a municipal proprietor can respond to unacceptably high noise levels at an airport by acting to reduce cumulative noise levels, instead of by controlling "peak" noise levels as measured by individual takeoffs and landings. *Global,* 727 F.2d at 250–51; *see also* *Santa Monica Airport Association v. City of Santa Monica,* 659 F.2d 100, 104–05 (9th Cir.1981) (allowing a municipality "flexibility in fashioning its noise regulations."). The Court in *Global I* had no factual record before it, and left open the question of whether the particular cumulative reduction contemplated by the defendant municipality in that action was formulated or applied in a "reasonable" manner, as required by the *Concorde* decisions. *Id.* at 251. Indeed, in a subsequent opinion, the Second Circuit went to lengths to clarify the narrow scope of its original holding, inviting plaintiffs to develop the factual record to pursue a claim attacking the defendant municipality's regulations as arbitrary or discriminatory. *Global Intern. Airways v. Port Auth. of New York ("Global II),* 731 F.2d 127, 129 (2d Cir.1984). Thus, the *Global* decisions advance the City's argument, but only to a point: the Second Circuit determined that municipal proprietors are permitted flexibility in addressing noise concerns, so long as they act in a reasonable manner supported by the factual and evidentiary predicate; it remains to be determined whether the circumstances in this case in fact warranted the City's actions. *Global I,* 727 F.2d at 251.

i) the curfew

■ On at least two occasions, both predating the Second Circuit's ruling in *Global,* district courts within the Second Circuit enjoined proprietor municipalities from enforcing curfews at local airports. *See County of Westchester,* 571 F.Supp. 786; *State of New York,* 552 F.Supp. 255. In *Westchester,* the Court was troubled primarily by the absence of any studies supporting the county's enactment of the challenged curfew. Indeed, the only two studies undertaken in advance of the enactment noted the absence of any significant noise impact from the airport and predicted that the curfew would result in "'an insignificant difference in the cumulative community noise exposure level,'" and only "'a small change in net community noise exposure.'" *Id.* at 792. Against this backdrop, the Court determined that "[t]he curfew on all night flight operations ... regardless of accompanying emitted noise [was] an unreasonable, discriminatory and overbroad

exercise of power by the County." *Id.* at 797.

Plaintiff relies upon *Westchester* as support for the proposition that curfews are presumptively invalid because they fail to target the loudest aircraft or times of airport operations. This reading of *Westchester*, however, cannot survive the Second Circuit's determination in *Global* that municipalities can elect to reduce overall noise levels, as opposed to peak noise levels. The better interpretation of *Westchester*—the interpretation with continued vitality—is that a proprietor's noise based regulations, of whatever type, must be reasonably formulated to ameliorate identified noise related problems. From this vantage, the *Westchester* holding was certainly correct. Because the county had no evidence either of unacceptable noise levels at its airport—at night or during the day—or of substantial benefits flowing from the enforcement of the curfew, the county could not proceed with that curfew.

In contrast to the circumstances confronting the Court in *Westchester*, the EIS in this matter provides ample empirical support for the City's decision to impose a curfew upon both weekday and weekend Heliport operations. By monitoring noise levels from several nearby receptor sites, it was determined that decibel levels from the Heliport exceeded desired levels, as referenced from various regulatory standards, in a densely populated neighboring community. Specifically, the data reveals "significant noise impacts" associated with the Heliport during both "peak" and "average" hours of operation. (Model Aff.Ex. G at S–7, III.E). Even when examined on a "single-event basis" (*e.g.*, an individual helicopter arrival, or departure), intrusive noise levels are apparent in connection with Heliport operations. (*Id.* at III.E–21, 23). In view of the considerable noise associated with the Heliport, the Court considers it reasonable for the City to enforce a curfew tailored to preserving relative tranquility during that portion of the day typically reserved for relaxation and for sleep. (*Id.* at III.E–3 (describing accepted regulatory

guidelines penalizing noise during usual sleep hours)); *see also Concorde II*, 564 F.2d at 1006 (endorsing noise analysis which "penalized flights scheduled during normal sleeping hours").

National insists that the EIS should be disregarded as support for the curfew because it proceeds upon the mistaken premise that all Heliport operations have historically occurred between 7 a.m. and 7 p.m.[7] The Court is not persuaded, however, by National's argument that the EIS therefore provides no basis for concluding that unrestricted nighttime operations at the facility would generate significant noise levels. As an initial matter, the City could not be expected to gather data reflecting unrestricted operations occurring between 11 p.m. and 7 a.m.; by agreement between the parties, there have been no operations, aside from emergency flights, during that period since 1989. (McGann Aff. ¶ 25). In any event, there can be no real doubt that unrestricted nighttime and morning operations would create disturbances in the vicinity of the Heliport. After all, a "single-event" is all that is required to give rise to intrusive noise levels. (Model Aff. Ex. G at E–21, E–23). Moreover, plaintiff's president insists that nighttime and early morning flights, even with the present 11 p.m. to 7 a.m. restriction, are not isolated events; National claims to have extensive operations after 7 p.m. and before 8 a.m. (Third McGann Aff. ¶¶'s 4, 5).

In sum, the Court believes that it is reasonable for the City to interpolate from existing data, and on the basis of National's own representations, that unrestricted operations during the period designated for the proposed curfew, would impose at least some significant burden upon the community neighboring the Heliport. Moreover, a nighttime and morning hour curfew represents a sensible compromise between National's interests in maintaining a viable business, and the interests of area residents in being free from noise and related annoyances. Therefore, in light of the generally high noise levels associated with the Heli-

---

7. This 7 a.m. to 7 p.m. premise, which National now assails, was utilized in the original drafts of the EIS prepared during that time that National was responsible for the document. (Dec. 12, 1996 Rand Aff.Ex. B at E–19, 22).

port, and recognizing that it is the City's prerogative to regulate noise without necessarily targeting only the loudest hours of operation, this Court views the City's curfew as a "reasonable, nonarbitrary, and non-discriminatory" exercise of its proprietary rights in connection with operations at the Heliport. *See Concorde I,* 558 F.2d at 84.

ii) Mandatory 47% Reduction In Operations

 In support of its decision to reduce existing Heliport operations by 47%, the City again relies principally upon its EIS. As already noted, that document confirms that there are noise problems associated with the Heliport; the facility generates "significant" noise levels during both peak and average hours of operation, and single-events give rise to "intrusive" noise levels, as well. (Model Aff.Ex. G at S–7, III.E–21, 23). The EIS further indicates that a 47% reduction in operations would result in reduced noise levels at the facility, and that other City heliports could absorb any traffic diverted from the Heliport without visiting any significant noise or environmental problems upon neighboring communities. (*Id.* at S–7, E–23, E–27). The City, however, offers no satisfactory explanation for the scope of its proposed reduction.

The City argues that the near halving of operations at the Heliport is justified as a means of reducing Heliport noise levels by redistributing helicopter traffic to other City controlled facilities in the New York metropolitan area. In support of its position, the City relies upon the decision in *Western Air Lines,* 658 F.Supp. 952. In that action, the Court upheld the Port Authority's decision to revise, from 2000 miles to 1500 miles, an existing "perimeter rule" prohibiting airlines from operating long distance nonstop routes out of LaGuardia airport. *Id.* at 953. The Port Authority "grandfathered" existing services, permitting continued operations outside of the 1500 mile radius by those airlines already providing such services at the time of the enactment. *Id.* The plaintiff in *Western* was new to the facility, having obtained a slot for operations at LaGuardia only after the new rule became effective, and was simply denied the opportunity to commence services to a location outside of the designated 1500 mile area. *Id.* at 953–54. The Court allowed the Port Authority to enforce its modified perimeter rule, with the anticipated effect of redistributing area flights to other facilities, specifically on the basis of "careful study" and considerable evidence that ground congestion was likely to impede operations at the airport. *Id.* at 960.

The 47% reduction in operations at the Heliport is more severe than the perimeter rule upheld by the Court in *Western,* and it is not supported by the sort of "careful study" undertaken by the Port Authority in that action. In contrast to the plaintiff in *Western,* who had obtained slots to operate at LaGuardia only after the institution of the new restrictions, National and other users have been providing services at the Heliport for over twenty years. The Resolution would not merely deny National the opportunity to provide additional services, or even freeze existing levels of service, but would slash current operations at the Heliport nearly in half.

As for the empirical support for the measure, there is no evidence in the record that the 47% reduction set out in the Resolution is in any way calibrated to achieve any particular noise based result. Indeed, the EIS does not evaluate the relative noise levels that could be expected to result from a lesser percentage reduction in operations. With respect to the 47% reduction that the City has settled upon, the EIS reports simply that the provision will result in "peak day conditions produc[ing] noise levels smaller in magnitude and with significant impacts for less hours." (Model Aff. Ex. G at III.E–23). In other words, the report verifies—predictably enough—that less Heliport activity will mean less Heliport noise. What the report does not do is evaluate the specific impact that a blanket 47% reduction in operations can be expected to have on noise levels during those hours of operation still permitted under the terms of the Resolution as it now exists. Indeed, the EIS operates on the presumption that the 47% reduction in operations will be achieved by the elimination of weekday sightseeing services—a proposed limitation not

ultimately incorporated into the Resolution. Thus, the EIS assesses the likely consequences of a 47% reduction in services, but does not assess the consequences of the particular 47% reduction now mandated by the Resolution.

With respect to the ability of other area heliports to absorb diverted traffic, the EIS analysis is cursory. Without explanation, the EIS assumes that other City heliports would employ the AStar helicopter to service additional tourist customers, a model "considerably quieter than the S–58T which is currently used for approximately half of the sightseeing operations at the East 34th Street Heliport." (Model Aff. Ex. G at III.E–26). It is perhaps not surprising, given this most convenient premise, that the EIS concludes that noise levels at the City's other heliports will remain at acceptable levels. It also concerns the Court that the EIS does not account for the fact, as represented by the City in its RFP, that the future of one of the two heliports designated by the EIS to absorb diverted traffic is "in doubt." (Model Aff.Ex. Q at 3–4). In short, the City does not demonstrate that those operations effected by the 47% reduction in services can be accommodated by other area facilities; they may well be lost completely. This result would "inhibit the accomplishment of legitimate national goals,"—namely, the encouragement of air commerce and the provision of efficient transportation. See Concorde II, 564 F.2d at 1011.

The gaps in the City's noise based explanation for the 47% reduction in services highlights the extent to which that particular reduction was not actually devised on the basis of any noise based considerations. Instead, the proposed 47% reduction in services was settled upon based simply upon a calculation of the impact that eliminating all weekday sightseeing flights could be expected to have upon total operations at the facility. (Model Aff.Ex. K, G at II.B–7). The City provides no documented explanation for this initial determination, since abandoned, to eliminate weekday tourist services. Thus, to the extent the City now insists that the reduction in operations mandated under the Resolution will garner a significant improvement in noise levels at the facility, it is relying upon a post hoc justification for a decision which was conceived on a basis seemingly unrelated to any appropriate proprietary considerations. Thus, even if the proposed reduction in operations resulted in a reduction in noise levels at the Heliport, the Court remains concerned that this measure grew out of considerations unrelated to noise, and perhaps more "parochial" in nature. See Concorde II, 564 F.2d at 1011.

In sum, the proposed 47% reduction in Heliport operations raises a difficult question. On the one hand, the evidence demonstrates that there is too much noise at the Heliport, and the EIS confirms that a reduction in services will result in a reduction in noise levels. Of more importance to the Court, however, the near halving of operations at the facility is an especially severe restriction, originally settled upon for seemingly arbitrary reasons, and now defended on an incomplete and imperfect record. For these reasons, the measure cannot be deemed "reasonable, nonarbitrary and nondiscriminatory," and the Court cannot permit the City to proceed with its proposed 47% reduction in Heliport operations. See Concorde I, 558 F.2d at 84.

iii) elimination of weekend operations

 The City's plan to eliminate weekend operations at the Heliport was not founded upon any scientific analysis of the likely impact of the measure. In fact, the final EIS contemplated the virtual opposite of this approach; it operated upon the presumption that weekday sightseeing operations—not all weekend operations—would be eliminated. (Model Aff.Ex. G at S–1). Not surprisingly, then, the final EIS devotes no particular attention to the extent or noise impact of weekend operations, and therefore provides no basis for evaluating the likely impact— cumulative or otherwise—of the elimination of weekend services. Moreover, neither the EDC nor the CPC proposed or considered the elimination of weekend services. It was not until the City Council's final review of the Application, the EIS, and the community comments that it reversed course and settled upon the complete elimination of weekend

services as a condition to the grant of the special permit. In light of *Concorde's* concern with the "appearance of whim or caprice," this Court cannot permit the City to eliminate all weekend operations at the Heliport on the basis of a last minute, and seemingly subjective, determination. *See Concorde II,* 564 F.2d at 1005.

### b) Prohibition on Certain Helicopters

The Second Circuit's decisions in the *Concorde* cases are especially informative for purposes of assessing the City's determination to eliminate sightseeing operations by Sikorsky S–58T, and other craft of similar size. The *Concorde* decisions, after all, were addressed specifically to the adequacy of the New York Port Authority's treatment of a particular aircraft—*i.e.,* Britain's Concorde supersonic aircraft. By its repeated delays in granting airport access, and ultimate inaction, the Port Authority effectively excluded the Concorde from New York area airports. As finally determined by the Second Circuit in *Concorde II,* these delays were unwarranted in light of the fact that the Concorde satisfied the same noise criteria as applied to other craft permitted to operate in the region. *See Concorde II,* 564 F.2d at 1012. Because objective noise criteria provided no satisfactory basis for excluding the Concorde, the Court acted to guard against the possibility that other, impermissible, considerations animated the Port Authority's inaction. The Court lifted the ban on Concorde flights. *Id.*

It is fundamental to the *Concorde* decisions, and to basic common sense, that a purported noise regulation cannot bar aircraft "on a basis other than noise." *See County of San Francisco,* 942 F.2d at 1398 (analyzing the Second Circuit's *Concorde* decisions). Such a plain failure of a regulation to be "fitted" to its ostensible, and permissible, purpose would necessarily run afoul of the requirement that a proprietor's regulations be reasonable and non-discriminatory. It is for this reason that the Court cannot accept the City's decision to eliminate operations by "Sikorsky S–58T helicopters or helicopters of similar or larger size which are devoted to sightseeing operations."

As is apparent on the face of Resolution 1558, the City has targeted the Sikorsky S–58T—and, potentially, other large craft—for its size and for the nature of the operations to which it is put. While the evidence indicates that the Sikorsky is a loud craft, it appears that it is not substantially—if at all—louder in its operations than the Agusta A109. (Second Johnson Aff. ¶ 13; Ex. A to Plaintiff's Reply To Defendants' Affidavit Containing Citations To The Record at Tab 36). Moreover, the Resolution language barring craft of "similar size"—as opposed, for instance, to "craft operating at similar decibel levels"—belies the extent to which the restriction is actually founded upon "a basis other than noise." *See County of San Francisco,* 942 F.2d at 1398. If a craft is large enough, the Resolution excludes it from the Heliport no matter how quiet its operations. This represents the antithesis of a "nondiscriminatory noise regulation that all aircraft are afforded an equal opportunity to meet." *Concorde II,* 564 F.2d at 1005.

Though an airport proprietor enjoys flexibility in crafting its noise regulations, those regulations must reflect noise based considerations, and they must do so in an "even-handed" manner. *See Concorde II,* 564 F.2d at 1012. To the extent that a restriction is meant to limit the operations of particularly loud craft, then, it is likely more advisable for a proprietor municipality simply to exclude craft unable to meet a particular, reasonable, noise criteria—perhaps based on decibel levels—than to select a particular craft for exclusion. *See, e.g., Arrow Air Inc. v. Port Authority,* 602 F.Supp. 314, 316 (S.D.N.Y.1985) (upholding prohibition on DC–8 aircraft equipment at New York's John F. Kennedy Airport; the prohibition was based upon federal regulatory standards grouping craft "by noise characteristics"). The relative wisdom of such an approach is fully evident on the facts of this case. Though the EIS demonstrates that the Sikorsky S–58T is a noisy craft, the empirical support for a restriction applying solely to its operations is underwhelming; the S–58T appears no louder—on most criteria—than the A109. Thus, with only mixed factual support, the City is left with a restriction which targets a particular make and model of a

particular manufacturer's craft, and only when it is put to a particular use. This approach is not "even-handed," and it smacks of "whim and caprice." *Id.* at 1005, 1011. Accordingly, it cannot be upheld.

### c) Restrictions on Sightseeing Routes

The City's regulation of routes—specifically, the prohibition against tourist flights using the Second Avenue corridor, and the restriction of north-south sightseeing flights to the East and Hudson rivers—must be rejected. The Court in *Concorde I* recognized that safety and efficiency dictate that "exclusive control of airspace management be concentrated at the national level." *Concorde I,* 558 F.2d at 83; *see also Northwest Airlines Inc. v. Minnesota,* 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944) (explaining the imperative for a uniform federal aviation system insuring that "[p]lanes ... not wander about the sky like vagrant clouds."). Otherwise, the possibility of "multiple, inconsistent rules," would create the prospect that "the rule applied [would] come literally to depend on which way the wind was blowing." *Id.* at 83. The Second Circuit avoided the risks inherent in such confusion by holding that airport proprietors are "vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations ... for *the airport and its immediate environs.*" *Id.* at 84 (emphasis added). *Concorde II* reiterated this important proposition: Congress must have "exclusive" responsibility for regulating "planes in flight"; airport proprietors play no part in this arena, but may exercise only a limited role in protecting the "local population from airport noise." *Concorde II,* 564 F.2d at 1010. In other words, a proprietor's right to regulate activities at an airport is just that, a right to regulate activities *at the airport;* it is not a right to regulate in the air.

Simply put, the City has no proper role, as the Heliport proprietor or otherwise, in designating the routes to be flown by aircraft engaged in particular operations.

### d) Markings Requirement

The City justifies the proposed markings requirement solely as an enforce-ment mechanism for the route restrictions just considered and rejected. (Appendix to October 30, 1996 Rand Aff. at 6). There appears to be no independent justification, consistent with appropriate proprietary considerations, for this measure. Moreover, the measure seems not to have been carefully or "reasonably" devised even for its intended, improper, purpose; it is doubtful that the specific requirement as set out in the RFP—markings visible from 1400 feet in the air—can even be achieved. (McGann Aff. ¶ 108). For these reasons, the Court strikes down the markings requirement set forth in Resolution 1558.

### CONCLUSION

For the reasons set forth above, the City is permanently enjoined from enforcing the following provisions contained in Resolution 1558, as incorporated into the City's RFP:

1) The mandatory 47% reduction in operations

2) The complete elimination of weekend sightseeing operations

3) The designation of sightseeing routes

4) The exclusion of the Sikorsky S–58T from engaging in sightseeing operations, and

5) The requirement that all craft operating out of the Heliport be marked for identification

The City is not enjoined from enforcing its 8 p.m. to 8 a.m. weekday curfew, and its 6 p.m. to 10 a.m. weekend sightseeing curfew. The Clerk of the Court is directed to enter judgment accordingly.

**SO ORDERED.**